Just when we thought you were unopposed. Case number 12-3450, Jane Wayne v. the Regatta Condominium Association, and it's unheard of and incompetent. The attorneys who are going to make an argument, please step up to the podium and identify yourselves for the record and the party you represent. Good morning, Your Honors. Michael Razzak. I'm here on behalf of the plaintiff appellant, Jane Wayne. And I think what some would see is a very matter-of-fact, simple slip-and-fall case. The question, of course, is whether a trial court should have entered summary judgment. But before I try to go into the facts, I know the Court's familiar with it. I don't intend to spend time on it.    I'm not going to spend time on it. I'm going over all the facts again. But there's the question here of whether or not the plaintiff gets to take advantage of 5.01, the adverse inference. The Court's aware there was a video of the accident. Two of the witnesses said, Kennedy and Mirzow said, if we had the video, we could see if there was something on the floor. The video is gone. Our contention is that we should have this court, the trial court in this court, should be able to use the inference, the same inference that a jury would use under these circumstances. We suggest that 5.01 applies because, obviously, we had some evidence. If it was evidence that would support them, any prudent defendant would have brought it forward. And their argument is... It seemed like they were trying to be prudent. They tried to get the thing working. They knew they had problems with it. It wasn't like they said, oh, we got this video. Let's throw it in the ash can. Not at all, except it depends upon who you believe. That's what their version was. And they said, we called this M&R many, many times. But remember, Scott and his father said, we didn't get any calls. Scott said, if they called me, I would have come over and I could have fixed it. I think it's at page 362. He said, I could have recorded it. So if the jury decides to believe, and this is always a problem with 5.01, what do you need to do before you get to use it? We're not... You want to talk about 5.01. And I think the law that we're really looking at is spoliation law. And what is the purpose for which they were admittedly, ham-handedly trying to save the video? The purpose seems to me is just as plausible that they're trying to save it for their own practices or if they ever did get sued, that they could show that there wasn't any water there. I don't have any... Rather than that they were trying to voluntarily undertake a duty for your client. Weren't they put on notice? And that's... Well, of course, everybody's on notice. Well, that's exactly... That's not the only notice in this case, is that there was an accident. Well, no, and I disagree. Exactly where Judge Fitzgerald Smith was going is where I would tend to go on this. See, I worry about him. He's usually a plaintiff's attorney. And I can't comment either way on any of that here. I didn't know EUSTA was a verb. EUSTA, yeah. What we have here is, I think, an unusual scenario. We're all aware of the Martin case. The Supreme Court put restrictive limitations on what kind of notice somebody has to have before they have a duty to preserve it. Our point is quite simple, and they obviously violently disagree with me. When her husband, Chen Dong, the husband, went to the woman at the counter, talked about the accident, she sent him to the manager. He went to the manager, and in the course of it he said, I mentioned the video. That's three days later. The same three days, that manager gets back to Kennedy at the desk and says, you have to preserve that. I suggest to the court that that is sufficient notice to them. Obviously, Mr. Dong did not say, would you preserve that? But that's why I forwarded to this court the Killian recitation, the Killian case from the Seventh Circuit. In the Killian case, the question was whether or not the insured had told the insurance company, I need to know who the PPO is. He never said that. His wife was in the hospital, he made some calls, and the majority of the Seventh Circuit said those calls were enough to put the hospital, to put the carrier on notice, that this is what he was looking for, and that's what you should have told him. In this circumstance, why did Mr. Mirzwa think that Mr. Dong was talking about the video? He surely was not passing the time of day. His wife had been injured, and it's something that Mirzwa would have known was important to Mr. Dong, because keep in mind that when she went upstairs afterwards, everybody thought it was a slip and fall. They called downstairs and said, she can't see. That's not a normal event. And they know that when Mr. Dong talked to Mr. Mirzwa at the same time, he said, my wife was in surgery at Northwestern, and they're stabilizing her. That's not a broken ankle. And the gentleman at the counter at Mirzwa said to Kennedy, preserve it. I submit to the court that even our Supreme Court under Martin would be satisfied that that's a request to keep that video. I don't think anybody's trying to deprecate the injuries here. No, not at all. But the question that I have for you is, putting aside the notice issue that you're bringing up here, that they're on notice of something, where is the evidence, and what is it that we should rely upon if we were to reverse the trial court as to actual or constructive notice that there was an unnatural accumulation of some slippery slip? Separate and apart from the spoliation count. Right. And I understand that. Obviously, if it's a natural accumulation, we all know, we lose. Our position, I hope I've made it clear, is that we have produced evidence so that a jury hearing this case, difficult as it might be, I'm not saying this is the best case I've ever had for the plaintiff. I know that. Even in your Fintech case back in the days of your youth. He's going to get you. I know. There was evidence of mopping ten minutes beforehand in the aisle leading up to the sanctuary, wasn't there? Correct. And there was. You at least had that. And we had that. And that was not my fault. That wasn't the trial lawyer. That was Judge O'Brien. It's never the appellant who's fault. We always get blamed. And they do. In that case, however, keep in mind, the woman who fell, I don't know, it was slippery, but nobody knew if there was anything where she fell. And the court was willing to allow the jury to say, well, if there was water here, and some testimony that they had mopped, that was enough to infer, to imply that she fell on some water. In this case, I think, I hope we've eliminated the fact that this could be tracked in water. If it's not tracked in water, then it's not a natural accumulation. The testimony is, and I know it's not the most I've ever had, the testimony is she stood on a mat outside. She said it's not wet, there's a canopy overhead. And she came back in and she walked over another mat. They said there was so much water on her shoes, that's where it had to come from. I submit that a jury would find that you can't get enough water on your shoes, walk over a carpet and get it all over the floor to the extent that her husband said it was. That's the critical thing, I think. Now, there's no evidence that before this happened, they were out there mopping. Like you can see, look at the weather we've been having here. So on days like this, you walk through the big buildings downtown with the marble floors, and they've got the runners and they've got people mopping, and they've got the hazard cones, right? Sure. There was no evidence of that before this happened. It wasn't raining, it wasn't snowing at all. There was no evidence of any kind of mopping one way or the other beforehand. That's correct, I agree. And afterwards, what happened? The plaintiff was in the lobby with her husband and others for a period of time, am I right? She was only there momentarily. Keep in mind, all she did was walk out the door a couple of feet and come right back in. And she'd sat there for a minute waiting for her husband to bring the car up. Was there any evidence of mopping after? No. We're talking about mopping, but wasn't there heat in the floor? There was, the floor was heated. Any water that would have been there would normally evaporate with the heat, unless the heat might not work, and nobody seems to have explored that. Nobody did. As a fact, I don't know that even the defense, I'm not sure they even raised it in their brief, that the floor was heated. I saw it was a heated floor and said, well, everything would evaporate. But what if it's not water? We don't know what it is. If it's not tracking. You're getting into the land of speculation now. If I have proven, if I've raised the question of fact about whether it's water, if that water there was not from her shoes, then where was it from? There wasn't any water from our perspective. There was no water to track in. There wasn't. The husband said if there was water outside. The husband said it was frozen outside. He said it was so close to January. He said there isn't any water outside. They had witnesses who said it looked damp and dark. All they could ultimately say was the gentleman, the general manager, or the construction person said it looked like it was damp because I could see the color of it, and the woman behind the desk said I thought it was damp because of the color. Nobody knows if the outside carpet was damp. But Mrs. Wang said it wasn't. There was nothing on it. And the husband said if there was anything there, it would be frozen. Where did this much water come from on her shoes? If I'm standing in front of a jury and I can't persuade them that something the size of a sink, nobody asked them what size of a sink, I understand, all came in on my shoes, it can't be. It had to come from someplace else. I don't know where. But we have, because of this unusual fact scenario, we've got somebody sitting at a desk and another witness who says if that person could look, they could see a dime at 20 feet. It must have been there sometime before, and she had ample opportunity to see it. So is it your position, and I can't honestly discern from the briefs, is it your position that the testimony that there was water the size of a sink, whatever sink we're talking about, that that is what should have supplied the trial court with enough constructive notice that there was an unnatural accumulation? That's correct. Because to get that much water on the floor, and I apologize for not making that clear, to get that much water for the floor. Well, it's not that you didn't make it clear that there was some testimony. My question is what is it about that testimony that should lead this court to suggest that it was an unnatural rather than a natural accumulation? Because if it was a natural accumulation, it would have to, the argument from the defense is it came from her own shoes. That's their argument to this court, is that she brought all that water in with her own shoes. I would simply stand in front of a jury and say with a very straight face, you can't have that much water in your shoes. I use the example, when you come home at night, you can get water on your floor. You can't cover an area, the husband said it covered an area the size of a sink. It wasn't the footprint. I understand that's not the greatest argument, but a jury does get to use their common sense, and I think a jury would say, well, how did she get all that water in on these little shoes? She's a little tiny woman. It can't happen, and if it can't happen, then it had to come from someplace else, and if it came from someplace else, the person at the desk could see it, or it was something put there by an employee. I don't know which. We'll never know. Or maybe other people tracked it. Maybe somebody, well, the same problem occurs then. If the other people were tracking water in, the same two questions, how did it get so much in one spot? And keep in mind that the woman at the desk said, my job was to make sure that was mopped if there was any water there at all. She said, we even got rid of the dog prints. We don't want dog prints, is what she said. That means that if somebody else was tracking the water, presumably she would have cleaned it up. I understand that we're looking at circumstantial evidence, but I think I said as one unknown prosecutor said, you can't change, once you get the facts set up, you can't change them around like you can change around what you remember and what you don't remember. That's pretty easy to change. That would be more interesting if you could. It would. That's basically our position. You know, obviously I understand it. I just want to add that the 501 inference, that's separate from the spoliation. I think if we put the 501 inference on top of her testimony that it wasn't wet outside and the husband's testimony that it was a large amount of water, those three things would put a jury in our corner because they might well say, well, maybe that video did show somebody dropping something. It's a lobby where people walk through. Weren't they in themselves negligent, too, in the fact that they were on notice that the thing didn't work? So doesn't that backdoor you into on one of those cases you cited to say, maybe I don't have to show everything on the initial proximate cause negligence if they were so deficient that shows a door? If they weren't paying attention to see all those other things, then they're just negligent on the face of it. My arguments can almost become circular as you look at the different levels of negligence here, and I don't want to do that because I could be here for a long time. But I also understand it's late in the morning. Unless, Your Honor, you have some further questions for me, obviously we're looking for a reversal. I'm done harassing him. Are you done, Jim? Yeah, I was trying to be nice. I was trying to make up for you. Thank you very much. Many have tried. I know, it's rough. See, we can't pick on you the way we do. Oh, please. Oh, please, feel free. He's pickable. What about the testimony? You know, if you talk about a question of material fact, and, you know, you've been around the block. Sure. What about the testimony of her husband who says that there was this water in that volume, whatever the volume was, that was there after she fell and after, you know, she got water on her coat and the rest of it? Isn't that enough just to get it to the jury? No, and here's the reason. Why? You have to begin at the beginning. Four people were in that lobby before she even went out the door. All four of them, including the plaintiff, including her husband, said there was nothing on the floor, nothing. So it's four to one. Is that your idea? Four to zero. I'm just talking about before her fall. There's nothing on the floor, including Ms. Wang herself. She walked on the way out. She walked exactly over the spot that she later fell, and she testified there's nothing on the floor. She gets outside. It's undisputed that that mat outside was wet. Handler testified it was wet. He didn't say I believe it was wet. She made testimony of it. Exactly. Her testimony was not that it was not wet. She said she didn't pay any attention to the mat on that day that she fell. What she testified to at her deposition was that she deduced, because there was a canopy, that it couldn't have gotten wet. But that's pure speculation on her part. We've shown that she had no basis for saying that. So there is no counter-testimony that that mat was dry. But when she comes back through, doesn't she walk over another mat of some length before she falls? Sure. She does. But as she's walking over that mat, she also testified she did not see anything on the floor. Handler said, I was looking at her walking in and the tile floor, and I didn't see anything. So her testimony is not entirely consistent with what her husband was saying. Is that what you're arguing? Well, her husband is saying, but keep in mind, though, when she fell, after she fell, Handler said there was water on the floor from her shoes. And he testified her shoes were so damp, they were damp all the way up to the seams, over the sole. So they were wet. Both shoes, now, not just the one that slipped, but both shoes were that wet. They couldn't have gotten that wet from the puddle or whatever was on that floor after she fell. So they had to be wet from outside. So there's undisputed testimony that it was wet. The fact that she walked over a mat on the inside does not mean that that was enough to remove that dampness from her shoes. What about her clothes? She didn't notice. I wouldn't say soak, but they indicate they were wet. Wet only afterwards, after she sat in the seat, not after she got up. After she was carried over to the seat. And her husband didn't notice until they were up in the apartment. So we have no idea whether it came from the seat or not. But here's the point. The seat inside the lobby? Yeah. There's no waterfall effect in there, is there? I threw it in as an aside. And it's pure speculation, but there's a possibility. The point is, and I think this is fair to say, that when we were talking with your opponent here, there's some speculation, it seems, that he's engaging in. And I think it's fair to say that there's some speculation here on the part of the defense as well. Well, let me address the mat inside. Then we'll get to the puddle itself and the husband's testimony. The mat inside, you mentioned yourself, you've seen the cones inside the building after the mats. And the reason is because those mats don't clean off your shoes. Right. You still are wet after you've walked over the mat. Was there any testimony that the inside mat was wet? No. Did Handler or anybody else cover that? Was there negative testimony? Handler said that it was not wet. The inside mat was not wet. That it was dry. Well, if it's, no. Go ahead. See, now there's an inconsistency, as he just breathed heavily. That's an inconsistency in itself. And my question is like yesterday. After I got through snow blowing for an hour, I walked in and my wife screamed at me because I had little drops. But I had been out there and my shoes were covered, but I still only had little drops. I had no big puddle. Sure. But, Your Honor, it's not inconsistent because he didn't go over there and feel whether she left wetness from her shoes. He just said that it wasn't damp like the mat outside was. The mat outside. Because when I take her to her clothes, then all of a sudden there's more water. There's enough water to create, on her shoes, to create that smear. That's what Handler said, is that it was in the shape of her shoe and then there was a smear of it. Yeah, that's consistent with what Handler said. Right. I'll return to the question that I started with, which is how can you reconcile or deal with the testimony from her husband that there was still, after she fell, enough water on the floor that he described it as being enough to cover a sink or the size of a sink? Well, keep in mind what he said. And this is a quote. He said it was a very thin layer. I was a stock boy. I mopped floors. You have a wrung out mop, very little dampness to it. I could cover this entire area with just that little dampness. So there's enough to cover a sink, even just from her shoes. And here's the bottom line, Your Honors, is we have four people all saying it was not wet before she fell, before she even went outside. It was not wet just before she fell, in that spot that she fell. And it was damp and her shoes were wet. To accept their theory, the jury would have to say, well, we weren't there. We can't get into what the jury would have done because we're talking about the trial court saying, and we're supposed to be effectively three judges deciding a summary judgment de novo. They said that there were no questions of the fact that a jury should decide. I understand that. And the reason is because no reasonable juror could do what they're asking them to do, which is disregard the testimony of all the witnesses that were there and reach a direct opposite conclusion from what they said based on nothing, based on pure speculation. Not only as to the source of that water, but how long it was there. They have to show that we had constructive knowledge of it. I think they'll admit that we didn't have actual knowledge. So it had to be there long enough for us to have spotted it. And what they do is they twist Handler's testimony. Handler said, I looked right at it and it wasn't there. Kennedy said, I looked right there, it wasn't there, it wasn't wet. And if it had been wet, I would have seen it. And then they twist that and said, well, they should have seen it then. But they haven't established the predicate that it was there before she fell. So what is the jury going to do? How can the jury disregard, they weren't there. This is years later. They would have to disregard all the testimony of the witnesses that were actually in that room, in that lobby, and find the exact opposite of what they saw. So the only should have known that I can see from reading the record here is the testimony of her husband that there was this thin layer of something wet the size of the sink. And the defense, on the other hand, is saying that that is only describing what she left with her foot that sent her airborne. Am I accurate in that? That's correct. But even if you speculate that it was from a different source, the question still is, how long was it there? And there's no evidence about that, none whatsoever. And there's no evidence that it was cleaned up afterwards. Correct. I just want to quick, I know this was a focus on the questioning of opposing counsel. I think there's some question also on the 501 and the spoliation, so I think you should cover that. Exactly. That's what I was going to get to. The 5.01 is a jury instruction. It's only for use at the jury or at trial. And the case law that we've cited in the brief is that you can only use that when the party has control over the witness or the document at the time it's being presented. Now, I'm not going to argue, the case law only addresses its use at trial, not on summary judgment. But the bottom line is it's when they should be presenting it. Now, it's undisputed, though, we didn't have that video at the time the motion for summary judgment was filed. So by its very own terms, 5.01 does not apply. You didn't have it at the time that the protective order was cited. Right. Is that one of those ex parte protective orders? Yes. Okay. We didn't have it even by the time the complaint was filed. We didn't have it by the time the motion for protective order was filed. And we didn't have it when we filed the motion for summary judgment. That's why we didn't present it at that time. But 5.01 says that if at the time we should have presented it, we have control of it and we don't present it, that's when they get that instruction. But we didn't have control of it at that time. So 5.01, by its own terms, does not apply. We've also cited the case, the Amchem case, which says that almost directly on point, it's where somebody, as a matter of course, taped over an audio recording and they said that's a reasonable excuse. 5.01 cannot be used in that. Getting directly to the spoliation claim, the general rule is we don't have a duty. The plaintiff would have to show an exception to that general rule. First is that there was a special circumstance. Under Martin v. Keeley, the Supreme Court said there is no special circumstance until the plaintiff himself or herself requests that you keep it.  It didn't seem like your folks needed the plaintiff to tell them. Because of your own activities, they were trying to save it. Well, we have a policy to keep those kind of incidents for ourselves. Why should we care that the plaintiff didn't use the proper articulation and request directly that it be saved or demand or whatever? That's essentially what the Supreme Court said is required in Martin v. Keeley and what this Court did in the Kilberg case. The defendant has to have knowledge that the plaintiff wants it kept in order for there to be a special circumstance creating a duty to keep that evidence. Now, contrary to what counsel said, during this conversation three days after the incident between the husband and Miroslav, our manager, Mr. Dong did not mention the tape. We told him about it. He didn't know anything about it. He didn't know there was even a security camera there. And when we told him about it, he was asked, what did you do then? I said, that's it. I didn't do anything. I didn't ask for it. I didn't even think of asking for it. So there was never even any mention by them. So there's nothing in that conversation that suggested to Miroslav or ourselves that they wanted a copy of the videotape. Our policy is for ourselves and our own benefit, the policy applies not just to accidents out of which suits may arise, but resident violations of our rules, criminal incidents, those kind of things. So it is for our own purposes that that policy was created. And under the Supreme Court case, we cited just the fact that we have that policy doesn't impose a duty on us to preserve evidence for the benefit of the plaintiff. And that's the key, is that we had to undertake to preserve it for the plaintiff's benefit. All we undertook even then, because our DVD burner was broken, all we undertook even then was to call M&R, the guys that did our security system. And we did that. We did that repeatedly. And we did it according to our standard procedure, which is we called the office. We don't call Superfund. We don't call the owner. And we don't call his son. Did one of them live in the building too? Yes, but only like a week before this incident. And there's no evidence that we ever undertook to bother a resident in his own apartment or condominium. Nor was there any evidence that Mirza was even aware that the guy was living there. But regardless, we never undertook to contact him. We followed our standard procedure, which is to call the office. They don't deny that that's what we did. Now, Superfund said, yeah, they only called me once, but that was because it's the seventh day. That's why we called them, because nobody's responding to us. It's not our fault. It doesn't impose a duty on us to have to engage in extraordinary measures beyond our undertaking to preserve that evidence. Thank you. Thank you. Mr. Gatzan. I understand. Because it's so factually specific, I just wanted to point out that at one point, Mrs. Wang said that there was nothing on the mat to make her shoes wet. And at another point, Mr. Handler denied there was a carpet outside. He said the pavement was wet. And Mr. Handler at 565 said he did not look at the marble floor. My point is that Mr. Handler's testimony shifts back and forth. And I think from our perspective, obviously, we get the use from his testimony of what favors us at this point. Unless the court has further questions, I think we've elaborated in everything we could. Thank you very much. Interesting case to be taken on advisement, and a decision will be issued in due course. Thank you. Thanks.